IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 17, 2007 Session

## THOMAS R. JONES, JR. v. HEATHER L. RUSCH-JONES

**Appeal from the Fourth Circuit Court for Knox County**
**Nos. 97520 & 97555     Bill Swann, Judge**

_____

**No. E2006-01998-COA-R3-CV - FILED JULY 19, 2007**

_____

Following a short marriage of less than four years, Thomas R. Jones, Jr. ("Father") filed a complaint for divorce from Heather L. Rusch-Jones ("Mother"). Mother filed a counter-claim also seeking a divorce. Both parties sought to be the primary residential parent of their young daughter. While this case was pending, both parties filed competing petitions for orders of protection. Father's petition was granted; Mother's was not. Following a very lengthy trial, the Trial Court designated Father as the primary residential parent and awarded Mother supervised and restricted co-parenting time. The Trial Court awarded Mother a limited amount of alimony. Mother appeals raising numerous issues, including a challenge to the Trial Court's designation of Father as the primary residential parent and the amount of alimony she was awarded. We affirm the judgment of the Trial Court and remand for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Fourth Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which SHARON G. LEE, J., joined. CHARLES D. SUSANO, JR., J., filed a separate concurring opinion.

John D. Lockridge and Sammi S. Maifair, Knoxville, Tennessee, for the Appellant, Heather L. Rusch-Jones.

Virginia A. Schwamm and Donna H. Smith, Knoxville, Tennessee, for the Appellee, Thomas R. Jones, Jr.

# OPINION

## Background

This is an appeal from an exceptionally contentious divorce proceeding. The parties were married in July of 2000 and have a daughter who was born in March of 2003. Father filed a complaint for divorce in June of 2004 alleging Mother was guilty of inappropriate marital conduct or, in the alternative, that irreconcilable differences had arisen between the parties. Father sought to be designated as the child's primary residential parent.

Mother answered the complaint and denied that she had engaged in any inappropriate marital conduct. Mother filed a counter-complaint seeking a divorce claiming Father had engaged in inappropriate marital conduct or, alternatively, that there were irreconcilable differences between the parties. Mother likewise sought to be designated as the child's primary residential parent.

There were numerous court proceedings involving temporary custody and temporary support issues and the like before the trial. There also were issues surrounding competing petitions for orders of protection filed by both parties. The Trial Court entered an order of protection against Mother and ordered Mother to pay Father's attorney fees incurred in the prosecution of the order of protection. Mother's request for an order of protection against Father was denied. Mother also filed two motions to recuse during the course of these proceedings. Both of these motions were denied.

Following a lengthy trial, the Trial Court issued an extensive memorandum opinion from the bench which, when transcribed, is over seventy-five pages in length. Both parties filed post-trial motions and the final judgment later was amended. The end result was that the Trial Court declared the parties divorced from each other pursuant to Tenn. Code Ann. § 36-4-129, after finding both parties had established grounds for divorce.[1] The Trial Court designated Father as the child's primary residential parent. Because the Trial Court found Mother to have some psychological issues, Mother was awarded limited and supervised co-parenting time. The Trial Court made the property distribution. The Trial Court refused to award Mother any rehabilitative alimony. The Trial Court allowed Father and the child to remain in the marital residence. Mother was ordered to vacate the marital residence immediately and Father was required to pay for Mother to stay in a hotel for one week as transitional alimony. The Trial Court awarded to Mother as alimony in solido an amount equal to one-half of the total payments Father had made on his student loans during the marriage. Finally, the Trial Court noted that it had previously ordered Father to pay $7,500 toward Mother's attorney fees as alimony in solido. The Trial Court then stated that each party "shall hereafter be responsible for the remaining attorney fees that they have incurred."

---

[1] Tenn. Code Ann. § 36-4-129(b) (2005) provides that the "court may, upon stipulation to or proof of any ground for divorce pursuant to § 36-4-101, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone."

Mother appeals claiming: (1) the Trial Court erred when it failed to grant her motions for recusal; (2) the Trial Court erred when it designated Father as the child's primary residential parent; (3) the Trial Court erred in restricting her co-parenting time and in requiring her co-parenting time be supervised; (4) the Trial Court erred when it refused to award her rehabilitative alimony; (5) the Trial Court erred in the amount of transitional alimony awarded; (6) the Trial Court erred with regard to its award of attorney fees and discretionary costs; (7) the Trial Court erred when it granted Father's request for an order of protection; (8) the Trial Court erred when it made the order of protection permanent; (9) the Trial Court erred when it awarded Father attorney fees incurred in prosecution of the order of protection; (10) the Trial Court erred in the property distribution by failing to award Mother certain items of property she claims were her separate property; and (11) the Trial Court erred when it awarded Father a judgment for damages to his separate property allegedly caused by Mother. Mother also challenges two evidentiary rulings of the Trial Court.

## Discussion

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

The trial in this case lasted over twenty-five days with numerous witnesses. The most significant trial testimony was discussed in some detail in the Trial Court's detailed 75-page memorandum opinion. Given the length of the trial and the number of witnesses, we will discuss only the relevant highlights of the trial testimony and the Trial Court's findings.

Although the competing petitions for order of protection had in large part been resolved by the time of trial, they nevertheless had an impact at trial. When granting Father's petition for an order of protection, the Trial Court made specific factual findings. The Trial Court found that on one occasion Mother repeatedly hit and kicked Father and on another occasion Mother hit Father on the back. Mother generally denied engaging in such conduct, but at trial witnesses were called who testified that Mother had admitted to them that she had hit Father. In addition, at least one witness testified that Mother stated she could have Father "offed." In short, the facts do not preponderate against the Trial Court's determination that Father was the party in need of an order of protection and that it was Mother who was the physically abusive spouse.

At trial, Father requested the order of protection be modified to allow for social contact. Because the Trial Court concluded that Mother had violated the order of protection in "many instances," the Trial Court refused to modify the order of protection and instead made it

permanent.[2] The evidence does not preponderate against the findings of the Trial Court relevant to its decision to make the order of protection permanent. Therefore, we find no reversible error by the Trial Court in making the order of protection permanent.

Mother also claims the Trial Court erred when it awarded Father his attorney fees incurred in prosecution of the order of protection. Mother further claims that her attorney should have been permitted to depose Father's counsel regarding the amount of the attorney fee that was claimed.

Tenn. Code Ann. § 36-3-617(a) (2005) provides as follows:

> **Protection orders - Filing costs and assistance.** – (a) Notwithstanding any other provision of law to the contrary, the petitioner shall not be required to pay any filing fees, litigation taxes or any other costs associated with the filing, issuance, service or enforcement of an order of protection authorized by this part upon the filing of the petition. The judge shall assess court costs and litigation taxes at the hearing of the petition or upon dismissal of the petition. *If the court, after the hearing, issues or extends an order of protection, petitioner's court costs and attorney fees shall be assessed against the respondent.* (emphasis added)

Based on the unequivocal and mandatory language of the statute, the Trial Court properly awarded Father his attorney fees and costs incurred in the prosecution of the order of protection.

As noted, Mother claims the Trial Court erred because her attorney was not allowed to depose Father's attorney regarding the amount of attorney fees and expenses that were claimed. In response, Father correctly points out that at the hearing on Father's request for attorney fees, Mother's attorney was allowed to question Father's attorney at length about the claimed fees and expenses. Following that hearing, the Trial Court reduced the expenses sought by Father by one-half and then awarded Father a judgment for fees and expenses totaling $4,408.43. Because Mother's attorney was afforded the opportunity to question Father's attorney about the propriety of the claimed fees and expenses, we find no error in the fact that Mother's attorney was not permitted thereafter to depose Father's attorney. The amount of fees and expenses awarded to Father is affirmed.

The Trial Court found that Mother had problems with anger management and the proof at trial certainly supports this conclusion. On at least two occasions Mother got angry and left the courtroom in the middle of court proceedings and once even threw something and yelled at her own attorney. Mother claimed that she suspected Father had sexually abused the child, but there was

---

[2] The Trial Court found "perhaps as many as 26 violations of the no-contact order ... [which] are acts of criminal contempt." The Trial Court subsumed all of Mother's violations of the order of protection into one count and sentenced her to ten days of incarceration. However, the sentence was suspended.

-4-

absolutely no evidence, medical or otherwise, to support this horrific accusation. In fact, the proof was that Father was a very good father and would never harm the child. According to the Trial Court:

> Dr. Freeman[3] notes, and the Court finds, that the mother played the child sexual abuse card with the pediatrician, suggesting that the child should be examined because the mother "had concerns." Nothing was found, and the Court finds that the mere suggestion of same is just an absolute impossibility … for this father.

A neighbor testified at trial that she witnessed Mother's attempt to back into Father's car which was being driven by Father at the time. Mother later apologized to the neighbor for doing that in front of the neighbor's child. Mother told the neighbor that she had "lost it" and was "overreacting." Mother admitted to this behavior at trial. The neighbor also testified that one week after Mother and Father were married, Mother told the neighbor that she was going to divorce Father and "take him for everything he had.…" The Trial Court also set forth the following testimony from the neighbor:

> [Mother] told me that they fought a lot. She said that she bought a lot of things for the house, that she would buy things on sale and just buy them and store them.… She told me once that she threw the ring out the window in an argument on the way to the Biltmore, later that she did not do that, but that she had not told [Father], that she had kept it and was going to go to New Jersey and would sell it. She told me this at her house. She also said that if I were to see her in the back yard with a shovel, [I] would know where [Father] was.

Father testified that Mother told him that he would never see his daughter again and to get ready "for the custody case of your life." Mother told Dr. Freeman that Father did not spend any time at the hospital when the child was born, an assertion that was flatly contradicted by the medical records from the hospital.

During one of the parties' many arguments, Mother supposedly threw a ring at Father which later could not be found. Father had given Mother a valuable ring and it was this ring that Mother allegedly threw at Father. When the ring could not be found, the parties made an insurance claim and received $9,000. Father testified at trial that he later learned that Mother had intentionally thrown another ring at him, and then took the valuable ring to New Jersey and pawned it.[4] When Mother was asked about this ring incident at trial, she refused to testify and invoked her Fifth Amendment privilege against self-incrimination.

---

[3] Dr. Elsbeth Freeman, Ph. D., is a clinical psychologist who evaluated both parties at the Trial Court's request.

[4] Mother's family lives in New Jersey.

Mother would buy things and hide them from Father. According to Father, Mother would make sure she got the mail from the mailbox, and he later learned that she did this so she could hide certain bills. In fact, Mother went so far as to have some of the credit card bills mailed directly to a friend's house so Father would not find out how much credit card debt she had incurred.[5] Mother admitted on cross-examination that Father did not want her to obtain any more credit cards, but she did anyway and charged over $20,000 on these additional credit cards. Mother admitted to having a problem managing money. Mother was fired from two jobs during the marriage, and fired from other jobs before the marriage.

After the parties separated and Father initially moved out of the marital residence, Father requested his clothes, as well as some furniture, sheets, and photographs of the child. When he finally received this furniture, some of it had been ruined. For example, one piece of furniture, which originally had belonged to Father's grandmother, had deep gashes in it. A desk was broken. Father's clothes were ripped and torn. An open bottle of Gold Bond powder had been thrown into a bag containing Father's clothes, ruining those clothes. Inside the furniture, Father found several photographs. There was an Easter family photograph and a wedding photograph, but the photos had been cut up and everyone except Father had been cut out of the pictures. Mother denied damaging the furniture and clothes, but she did admit to cutting up the photographs. According to Father, Mother gave him some sheets, but they were sheets that had been used as drop-cloths when the parties had painted the marital residence. The Trial Court found that Mother was responsible for this damage to Father's property. The Trial Court valued the items that were damaged or not returned to Father at $2,150, and entered a judgment for Father in that amount. The facts certainly do not preponderate against the Trial Court's finding that Mother was responsible for damaging Father's property and the amount of that damage was $2,150. We affirm the judgment to Father in the amount of $2,150.

We next will address whether the Trial Court erred when it denied Mother's motions to recuse. The first motion to recuse was filed in September of 2004. One of Mother's primary complaints was that the Trial Court continued with a "fifty-fifty co-parenting schedule" even though the Trial Court at that time knew "very little about the physical history of the child." Mother also was dissatisfied with the Trial Court because the Trial Court had granted Father's motion for a protective order and request for attorney fees, but denied a similar motion filed by Mother. The Trial Court denied the first motion to recuse, stating the "Court has no bias for or against either party, all rulings having been rooted in the evidence presented at trial …."

Mother's second motion to recuse was filed in November of 2005, after the trial was over and the Trial Court had issued its memorandum opinion. Again, Mother claimed that the Trial Court was prejudiced against her. Mother claimed the Trial Court made comments which Mother perceived to be demeaning to her and praiseworthy toward Father. Mother further claimed that the fact that the Trial Court ordered her visitation to be supervised was further evidence of the Trial

---

[5] Mother had these bills sent to the house of her friend, Allison Miller, who was called as a witness at trial and who confirmed that certain bills were sent to her house.

Court's lack of objectivity. Mother also points to the following comments made by the Trial Court to her attorney when denying the second motion to recuse:

> You attack the very essence of a judge's job description and you've done this before. I remember when I was a young judge on the bench you had a case go against you strongly and, you know, it must be because I had some sort of bias…
>
> So when you get an adverse result, don't attack the fact finder. If anything, look at your own job performance. If you need to beat up on somebody, beat up on yourself. Say I could have done this trial better. Somebody's got to be guilty, make yourself guilty, don't make the judge guilty.…

When the Trial Court denied Mother's second motion to recuse, the Trial Court made several other observations in addition to those selectively emphasized by Mother. For example, the Trial Court also stated:

> Well, Mr. Lockridge, you equate adverse findings by a trial judge with bias, with prejudice.… Now I think that you're old enough and long enough in the tooth to realize that there are clients that don't present as well as other clients and that when you represent clients that don't present as well as other clients, you're likely to get an adverse result… I have bent over backwards in both directions in this case and that memorandum opinion in [this] case is absolutely straightforward.

"[W]hether recusal is warranted is left to the discretion of the trial judge, and such decision will not be reversed absent a clear abuse of discretion on the face of the record." *Bd. of Prof'l Responsibility of the Supreme Court v. Slavin*, 145 S.W.3d 538, 546 (Tenn. 2004). Our Supreme Court in *Slavin* also stated:

> Tennessee has also recognized that "the preservation of the public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial." *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998). Thus, recusal is also appropriate "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d at 564-65 (quoting *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)). "Hence, the test is ultimately an objective one since the appearance of bias is as injurious to the integrity of the judicial

system as actual bias." *Id*. We note, however, that the mere fact that a judge has ruled adversely to a party or witness in a prior proceeding is not grounds for recusal. *Id*.

*Slavin*, 145 S.W.3d at 548.

Father argues that Mother's motions to recuse were nothing more than "claims that every ruling made by the Trial Court that was not in her favor demonstrated the Trial Court's prejudice … against her." To be sure, Father was the more successful litigant. However, during the course of this litigation, Mother filed some motions that were granted and Father filed some motions that were denied. Mother's lack of success primarily can be attributed to the Trial Court's determination that Mother was abusive and that she was not being truthful. The Trial Court went so far as to state that "this is a case, unfortunately, of widely disparate credibility … , and it does not favor [Mother]." The Trial Court provided specific examples of contradictory testimony given by Mother and why the Trial Court believed that testimony was untruthful.

In *Wells v. Tennessee Bd. of Regents*, our Supreme Court observed:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). *See also Lockmiller v. Lockmiller*, No. E2002-02586-COA-R3-CV, 2003 WL 23094418, at *4 (Tenn. Ct. App. Dec. 30, 2003), *no appl. perm. appeal filed* ("The cases are legion that hold a trial court's determinations regarding witness credibility are entitled to great weight on appeal."); *See also McBrayer v. Smitherman-McBrayer*, No. E2006-00040-COA-R3-CV, 2007 WL 187938, at * 5 (Tenn. Ct. App. Jan. 25, 2007), *no appl. perm. appeal filed* (emphasizing the importance of assessing witness credibility when a trial court is making a decree of primary residential status and establishing visitation).

Given the vastly contradictory testimony offered by the parties on various issues, the Trial Court was required to make a credibility determination, and it did just that. There is no clear and convincing evidence that the Trial Court's credibility determination was in error. Keeping the Trial Court's credibility determination in mind, we believe the adverse rulings as to Mother were based not on any prejudice against Mother or her attorney, but rather on a disbelief of her testimony and a conclusion that she was abusive. While the Trial Court's comment made to Mother's attorney concerning an incident between them when the judge "was a young judge on the bench..." was inappropriate, it does not rise to the level of demonstrating any prejudice toward Mother or her attorney. After thoroughly considering all of Mother's various arguments on this issue, we conclude that the Trial Court did not abuse its discretion when it denied Mother's motions to recuse.

The next issue is Mother's claim that the Trial Court erred when it designated Father as the child's primary residential parent. In *Burnett v. Burnett*, No. E2002-01614-COA-R3-CV, 2003 WL 21782290 (Tenn. Ct. App. July 23, 2003), *no appl. perm. appeal filed*, this Court discussed the relevant standard of review in child custody cases. We stated:

> The standard of review on appeal for issues addressing child custody and visitation was set forth by our Supreme Court in *Suttles v. Suttles*, 748 S.W.2d 427 (Tenn. 1988), and recently reaffirmed in *Eldridge v. Eldridge*, 42 S.W.3d 82 (Tenn. 2001). In *Suttles*, the Court acknowledged the general rule that:
>
>> Although … "the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge," *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. App. 1973), and that the trial court's decision will not ordinarily be reversed absent some abuse of that discretion, "in reviewing child custody and visitation cases, we must remember that the welfare of the child has always been the paramount consideration" for the courts. *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983)….
>
> *Suttles*, 748 S.W.2d at 429. The Supreme Court further explained the abuse of discretion standard in *Eldridge*, stating:
>
>> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243,

247 (Tenn. 1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

*Eldridge*, 42 S.W.3d at 85.

*Burnett*, 2003 WL 21782290, at **5, 6.

A list of non-exclusive factors to be considered by the trial court in child custody matters are set forth in Tenn. Code Ann. § 36-6-106(a) (2005) which provides, in relevant part, as follows:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; …

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

\* \* \*

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; …

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

In making its custody determination, the Trial Court discussed the various factors as follows:

[L]et me note that both of these parents demonstrate characteristic one, "love, affection and emotional ties" between themselves and [the child]. As to criteria two, both have the disposition to provide her with food, clothing, medical care and other necessary care. Mother was the primary caregiver when the child was very young. The father has been very active in her life throughout, and when this case began, a 50/50 caretaker of the child. He did well during that period of time, as did mother.… Factor three is not relevant. Factor four is the stability and respective family unit of [the] two parents. This is of limited relevance. The mother appears to have an excellent stepfather; the father has an excellent mother. Factor five is extremely relevant: mental and physical health of respective parents. Factor eight, the evidence of physical or emotional abuse to the other parent, is extremely relevant … and it reflects very badly on the mother, as does ten, the willingness and ability of each to facilitate and encourage a close and continuing parent/child relationship between the child and the other parent.

The Trial Court properly considered the pertinent statutory factors. Given the evidence contained in the extensive record before us, we conclude that the Trial Court did not abuse its discretion when it determined that, overall, the relevant factors favored Father and that it was in the child's best interest for Father to be the primary residential parent.

The next issue involves the amount of Mother's co-parenting time and the requirement that her visitation be supervised. When the Trial Court initially declared the parties divorced and designated Father as the primary residential parent, Mother was awarded standard co-parenting time which did not have to be supervised. Father filed a post-trial motion seeking to restrict Mother's co-parenting time because, according to Father, his daughter told him "You've been mean to Mommy and stole her house and she has to move far, far away back to New Jersey…." The child apparently made similar comments to her care-giver. Father also claimed:

-11-

Since the close of proof in this matter, the Mother has made statements to the Father that cause him continuing concern about the Mother's psychological stability. Specifically, on October 4, 2005, the eve before the Memorandum Opinion was delivered to the parties, the Mother called the Father and told him that she knew where the Father's attorney lived, and knew what color and make of car the Father's attorney's children drove.

Following a hearing on the allegations made by Father in the above motion, the Trial Court credited Father's testimony and reduced Mother's co-parenting time and directed that her co-parenting time be supervised.

Given Mother's behavior throughout the marriage and the course of these proceedings, it certainly is understandable why the Trial Court ruled the way it did. Nevertheless, we believe it is in the best interest of the child for Mother to have more co-parenting time with the child and that her co-parenting time should be unsupervised. We, however, are reluctant to definitively institute such a requirement at this time because this Court does not have before it any proof concerning Mother's post-trial behavior, including additional inappropriate behavior, if any. Therefore, on remand, the Trial Court is instructed to conduct a hearing on this issue. If Mother has not engaged in further inappropriate behavior post-trial which would rise to the level of necessitating that her visitation continue to be supervised, then the Trial Court is instructed to enter an order providing Mother with standard, unsupervised co-parenting time.

The next issue is whether the Trial Court erred when it denied Mother's post-trial motion to have certain property deemed her separate property. Local Rule 10 of the Knox County Fourth Circuit Court provides, in relevant part, as follows:

> **10.** **Pre-Trial Stipulations as to Separate and Marital Property.** At least forty-eight (48) hours before the day of trial, the parties shall file with the Clerk three (3) JOINTLY EXECUTED AGREED STIPULATIONS as to real and personal property, setting forth, pursuant to the criteria of Tenn. Code Ann. § 36-4-121: (1) the real and personal separate property and debt of each of the parties; (2) the real and personal marital property and debt of the parties; (3) the remaining real and personal property and debt of the parties, the character of which is disputed and to be decided by the Court. This last item consists of all real and personal property and debt of the parties not covered under the first two stipulations.… (emphasis in the original)

The parties complied with this local rule and submitted to the Trial Court a listing of items the parties deemed separate or marital property, along with a listing of disputed items. When the joint stipulation was presented to the Trial Court prior to trial, Father was not living in the marital

residence, and Mother was. Following the trial, the Trial Court awarded the marital residence and responsibility for the corresponding three mortgages to Father. There was approximately $27,000 to $28,000 in equity. The Trial Court ordered that the mediator's fees, Dr. Freeman's fees, and the court costs be paid from the equity. The remaining equity was to be divided 50/50 between Mother and Father.[6] Father had two individual retirement accounts with a combined approximate value of $7,370, which the Trial Court divided 50/50. The Trial Court valued Father's interest in a company he operated at $240,000. The Trial Court divided this asset 50/50 and ordered Father to pay Mother $60,000 within 45 days and the remaining $60,000 over the next twelve months at the rate of $5,000 per month.[7] The Trial Court ordered Father to pay additional debt totaling $42,000, which consisted of a Bank of America Visa debt of $21,000, a Chase Visa debt of $12,000, and a debt to a local credit union of $9,000. Mother was ordered to pay approximately $22,900 in various other credit card debt. Mother was awarded as her separate property a ring valued at $15,000.

After the Trial Court classified and divided the most significant items of marital property, divided the marital debt, and classified certain property as separate property of Father or Mother, all of the remaining property was deemed "line item property." The Trial Court instructed the parties to divide this property with Mother making the first selection, then Father making the next selection, and so on and so forth until all of the property was selected. The parties did just that.

Mother filed a post-trial motion claiming that she had neglected to include certain items of her personal property on the Local Rule 10 list of property. As a result, this property was not classified as her separate property because the Trial Court was not aware it existed. Mother claimed these items were gifts from her parents and should have been awarded to her as her separate property. Father claimed some of these items were marital property. The Trial Court denied the motion, stating, *inter alia*, that:

> [a]ny separate property or any marital property could have been and should have been stipulated or disclosed. And then we've gone through, disclosed as disputed status property. And we've had a classification argument. We did. These things are simply omitted. And in a case of this length, in particular, that is inexplicable.… At some point, the trial preparation phase ends, and the case goes to trial.

Mother's motion is nothing less than her request to reopen the proof to allow further testimony regarding the items she neglected to include in the Rule 10 list and to reopen the proof regarding how these items should be classified, i.e., as marital or separate property. We will treat

---

[6] The amount of Mother's share of the equity was to be reduced by the $4,408.43 in attorney fees and expenses Mother owed Father, any unpaid court costs associated with the order of protection, and the $2,150 judgment against Mother for the destruction of Father's property discussed previously.

[7] The Trial Court entered a post-trial order altering the payment schedule. According to the new order, Father was to pay Mother $30,000 by June 11, 2006, and then no less than $20,000 per year thereafter until the entire $120,000 was paid. Simple interest was to accrue beginning June 11, 2006, at the rate of 7½% per year.

Mother's motion as a Tenn. R. Civ. P. 59.04 motion to alter or amend the judgment. We review a trial court's determination of whether to grant a Rule 59.04 motion to alter or amend a judgment under an abuse of discretion standard. *See Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003). We conclude that the Trial Court did not abuse its discretion when it denied Mother's motion to reopen the proof following a very lengthy trial simply because Mother neglected to include certain items of property on the list as required by Local Rule 10 or because Mother neglected to update that list prior to trial or even any time during this lengthy trial. We note that Mother was living in the house both when the Rule 10 list was submitted to the Trial Court and during the trial. Mother acknowledges in her brief that many of these items were purchased by her parents when her parents were living with her in the marital residence over the summer. Mother has set forth no justifiable reason explaining why she did not include these items on the Local Rule 10 list or why she neglected to update that list before the parties divided the line items. The Trial Court's denial of Mother's motion is, therefore, affirmed.

The next issues surround alimony. The factors to consider when determining whether to award alimony are set forth in Tenn. Code Ann. § 36-5-121(i) (2005), which provides as follows:

> (i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
>
> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
>
> (3) The duration of the marriage;
>
> (4) The age and mental condition of each party;
>
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
>
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

When making its ruling on alimony, the Trial Court discussed the above statute and stated as follows:

> There are 12 factors for spousal support. Many of them have been dealt with under equitable distribution [of the marital property.] Some of them have not been spoken to. I would note, again, factor three is relevant; this is a brief marriage. I would note, again, wife's separate assets of $15,000. I would note, again, that the relative fault of the parties applicable to the spousal support statute favors the husband.…
>
> This is not a case for any significant spousal support. It is a brief marriage. In no way has the mother impaired her career or ability to make at least $36,000 a year.[8] She has let her college education languish, but that was her own choice. She presents no cogent plan for further education and no proof whatsoever of enhanced earning power through such education. Whether she

---

[8] The Trial Court noted that Mother's most recent employment was as a catering sales manager making $36,000 annually. When child support was set following the trial, Mother at that time was earning $48,000 per year, which did not include an unidentifiable amount of income as gratuity.

pursues it or not is her choice. The Court accordingly cannot find that the same would enhance her earning power, but who knows what the future holds? She suggests that she should have rehabilitative alimony of $3,000 per month for 48 months to finish her undergraduate education, to start after her daughter begins school. Well, the Court cannot find that rehabilitation is feasible, appropriate or proper, but we do note that there were some payments made upon the husband's student loans during the marriage, education completed before the marriage. Some payments were made upon the husband's student loans during the marriage. I either did not note the amounts, or they did not fall in the testimony, but whatever that amount may be, a judgment for the wife of 50 percent of that number to assist her, if she chooses, in her own education.[9] That number is pronounced as alimony in solido. Given the extreme financial load placed upon [Father] otherwise in this opinion, the payment of that number can be at a schedule far more relaxed than the schedule announced above.

The Court does not find the wife in need of rehabilitation. Indeed, she does not need further education. She earned $36,000 at her last job and was rising in her field of hotel and catering sales when she left her last employment….

Our legislature tells us that transitional alimony is for a determinative period of time, and it is awarded when the Court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded. There shall be some transitional alimony addressed below. It is non-modifiable.

The Legislature gives us another option for spousal support, which is called lump sum alimony or alimony in solido; I've spoken to that above. It is the only alimony in solido that will be pronounced in this cause. I touched upon attorney fees. The Court notes that the husband already paid $7,500 as alimony toward wife's attorney fees. Noting that, each party shall hereafter be responsible for the remaining attorney fees that they have incurred.

\*     \*     \*

---

[9] This amount of Father's student loan payments made during the marriage was later determined to be $10,395, thereby resulting in a judgment to Mother in the amount of $5,197.50.

-16-

It is most painful for this judge to inject yet another negative note in this already sad case, but the Court has already found that the wife has withheld from the husband at separation his clothing, his family furniture, all the contents of the home, save the sheets that were used for painting drop cloths, and maliciously damaged his clothing and furniture before it was finally delivered. She simply cannot be left in the home to serve as a trustee for these items for these two parties. There is substantial furniture and furnishings. She cannot serve as trustee. It would be negligent of this Court to allow that to happen. This Court will not endure any more litigation as to what items were damaged by the wife over the next seven days or what disappeared or what's not there.

Accordingly, she is not to return to the home today …. This is highly irregular, but this case has been highly irregular in every aspect. Her agent or agents shall go to the home today, in the presence of the husband and his counsel, and remove her clothing and uniquely personal effects, as well as 50 percent of all linens and towels. The entire transaction shall be videotaped…. It is to be anticipated that the wife will lodge in a hotel for the next seven nights. The Court directs that the husband shall today book and guarantee payment for seven nights' lodging at the Knoxville Marriott.… This is a non-modifiable incident of transitional alimony.

Tennessee courts have stated on numerous occasions that a trial court has broad discretion in determining the type, amount and duration of alimony, depending on the particular facts of each case. *See, e.g.*, *Wood v. Wood*, No. M2003-00193-COA-R3-CV, 2004 WL 3008875 at *4, (Tenn. Ct. App. Dec. 28, 2004), *app. denied* June 27, 2005 (citing, *inter alia*, *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001) and *Sullivan v. Sullivan*, 107 S.W.3d 507, 511 (Tenn. Ct. App. 2002)). Appellate courts are disinclined to second guess a trial court's decision regarding alimony unless it is not supported by the evidence or is contrary to public policies reflected in the applicable statutes. *Nelson v. Nelson*, 106 S.W.3d 20, 23 (Tenn. Ct. App. 2002). "The two most relevant factors in determining the amount of alimony awarded are the economically disadvantaged spouse's need and the obligor spouse's ability to pay." *Broadbent v. Broadbent*, 211 S.W.3d 216, 222 (Tenn. 2006).

The primary problem with Mother's argument on appeal regarding alimony is that she does not set forth what her specific monthly financial obligations are and how much money she needs to meet those obligations. Likewise, she does not set forth what Father's monthly financial obligations are and how much money he has left over each month after meeting those obligations. Because this critical information is not discussed, Mother's brief contains no corresponding citations to the record indicating where this information can be found in the voluminous record on appeal. *See Bean v. Bean*, 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000)("Courts have routinely held that the

failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue.")(citations omitted). Mother simply states that she now has monthly gross income of $4,000, plus an unidentifiable amount of "additional income as gratuity." We know that Father's gross income was substantially more at $12,371.50 per month. However, Father also was held responsible for much more than half of the marital debt. Mother does not discuss how much money, if any, Father is left with after paying the multiple mortgages on the house and the other debt he was ordered to pay, including a substantial amount of credit card debt incurred by Mother during this short duration marriage. In addition, Mother does not explain how her financial need and Father's ability to pay is affected by Father's requirement that he pay her $30,000 by June 11, 2006, and $20,000 per year thereafter until a total of $120,000 is paid, plus interest. In short, we are unable to ascertain whether Mother actually has a need for additional alimony or whether Father has the ability to make such a payment.

Mother also claims the Trial Court erred when it failed to award her any attorney fees over and above the $7,500 that Father was ordered to pay. An award of attorney fees in a divorce case constitutes alimony in solido. *See Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). Because Mother has not set forth the information necessary for us to ascertain whether additional alimony should have been ordered, we likewise will not disturb the Trial Court's finding on this particular point.

The final two issues are evidentiary. Taken verbatim from Mother's brief, these issue are:

A. Whether it was error for the Court to admit into evidence the report of Dr. Freeman, the Court's own expert witness, as well as her entire office file, when Dr. Freeman was present to testify and did in fact testify at the trial of this matter.

B. Whether it was error for the Court to admit certain hearsay statements of the minor child into evidence and use those statements as grounds for further restriction of the Appellant's co-parenting time.

In *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997), our Supreme Court observed that "questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *Id*. at 263-64 (citations omitted). Thus, a trial court's evidentiary ruling may be reversed only "if the discretion is arbitrarily exercised or abused."

Mother argues that the above evidence should not have been admitted and its improper admission resulted, in part, in her having reduced co-parenting time which had to be supervised. Since we have remanded this case for further proceedings as to Mother's co-parenting

time and whether that co-parenting time should be unsupervised, these evidentiary issues are rendered moot. We again emphasize that on remand Mother should be given standard co-parenting time that is not supervised, unless she has engaged in conduct post-trial that rises to the level of necessitating that her co-parenting time remain restricted and supervised.

### Conclusion

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for further proceedings consistent with this Opinion and for collection of the costs below. Costs on appeal are taxed to the Appellant, Heather L. Rusch-Jones, and her surety.

_____
D. MICHAEL SWINEY, JUDGE